## Mullins v. Commonwealth.

(Decided October 10, 1919.)

### Appeal from Laurel Circuit Court.

1. New Trial—Newly Discovered Evidence.—A new trial will not ordinarily be granted, for newly discovered evidence if such evidence is merely cumulative, unless it is of such a decisive character as to render it practically certain that it would have influenced the verdict. But for evidence to be cumulative within this rule it must be directed to the same fact as was the evidence to which it is cumulative. If its purpose is to establish an independent collateral fact or circumstance tending to establish the principal fact it is not cumulative within the meaning of this rule.

2. New Trial—Newly Discovered Evidence.—Before a new trial will be granted on the ground of newly discovered evidence it must be shown that due diligence was used to obtain it. It is not sufficient for this purpose to merely allege that such diligence was exercised; the applicant should go further and allege facts from which the court may determine whether such diligence was exercised.

3. New Trial—Newly Discovered Evidence.—Where it appears that the alleged newly discovered witnesses reside in the vicinity, and that the applicant or his attorneys had access to and talked with them either before or during the trial, a new trial will not be granted because of their testimony unless it further appears that they concealed the facts from the applicant after he made efforts to obtain them, and the same is true with reference to a witness who was present during the trial, whether he testified or not.

C. C. WILLIAMS and HAZLEWOOD & JOHNSON for appellant.

CHAS. H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, William Mullins, was jointly indicted with T. J. Johnson, Jr., by the grand jury of Laurel

county, for the murder of Luther Manus, and upon his separate trial he was convicted of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for ten years, and complaining of the judgment he prosecutes this appeal.

Practically all of the grounds authorized by the Code are contained in the motion for a new trial, but on this appeal only three contentions are made, and only one of those is discussed with apparent confidence on the part of counsel. The contentions referred to are: (1) that the evidence is insufficient to support the verdict; (2) error of the court in rejecting offered evidence, and (3) newly discovered evidence material to the defense, and which was not and could not have been discovered by the exercise of ordinary diligence. A disposition of these contentions requires a brief statement of the facts as disclosed by the testimony of both the Commonwealth and the defendant, as well as those contained in the affidavits of the alleged newly discovered witnesses.

The defendants were partners, engaged in the livery stable business in London, Kentucky, and had been so engaged for about a month before the killing, prior to which appellant lived at Mt. Vernon, Rockcastle county, the home of deceased whom he had known for about ten years, while defendant Johnson was wholly unacquainted with him. The homicide occurred about one mile south of Pittsburg in Laurel county between nine and ten o'clock on Saturday night. In the early afternoon of that day the deceased came to the defendants' stable and had a conversation with appellant relative to procuring some whiskey from a man by the name of Barnett who lived about six miles from London, and who either was or had been engaged in illicit distilling. After some conversation it was agreed that the three would make the trip to Barnett's, which was undertaken about four o'clock that afternoon, each of the parties riding horses obtained from the stable, and for which deceased agreed to pay. Each one carried along with him a pair of saddlebags, and when they arrived at Barnett's the deceased paid for three gallons of whiskey, which was put into quart bottles. Johnson also purchased a gallon, which was similarly prepared. While the whiskey was being bottled they all took a drink, it appearing that the deceased took a very large one. Mrs. Barnett testified on behalf of the Common-

wealth that while eating a lunch she had prepared the deceased attempted to cut a piece of sausage with the back of his knife when she said to him: "I will hand you a knife in a minute," whereupon appellant said: "Let him cut it with his big knife, damn him; I have hardly got good pockets in my clothes, much less a big knife." She said that she attempted to pour a second cup of coffe for deceased, when appellant remarked: "Give him all he can eat and drink, if he gets drunk I will kill him before he gets to London." She then adds: "They seemed to be joking and deviling, didn't seem to be mad." The whiskey was put into the saddle pockets after each party paid for the amount he purchased. Obtaining an extra pint for use on the way the parties started for London. At a bridge over the railroad about a mile north of Pittsburg they met some acquaintances to whom they offered and gave drinks, and it is claimed by defendants and two witnesses whom they introduced that deceased then called for a knife with which to open one of his bottles, and that appellant gave him his knife which was not returned after the bottle was opened. After leaving the bridge they stopped at the home of a Mrs. Warren. The parties alighted and deceased went into the house and had some conversation with Mrs. Warren about preparing supper for the three, but on account of the lateness of the hour she refused. She left the house and went to the gate where the two defendants were and requested them to take the deceased away because of his intoxicated condition, which they succeeded in doing, and the homeward journey was resumed. Johnson rode some little distance in front, while appellant and deceased were in the rear, riding along together. When passing the house of Tony Kerby deceased called for him, but did not succeed in arousing him. About a mile south of Pittsburg the road they were traveling led on to the pike, there being a slight sag at the intersection, and defendants testify that at that point the horse which deceased was riding stumbled and fell, throwing him upon the pike, and that he fell on his face. He got up, and appellant inquired of him if he was hurt, receiving the answer, "No, by God, I ain't hurt much, but my face is skinned a little." He got back on his horse and Johnson expressed astonishment at the horse falling, whereupon deceased cursed and applied vile epithets to him, accusing him in substance of furnishing

deceased an unsafe horse. The epithets, according to defendant's testimony, continued to be applied to Johnson as the parties traveled the pike for a distance of 150 or 200 feet, when deceased ran his horse in front of Johnson and alighted, grabbed the latter and pulled him from his horse, causing him to fall with his back on the pike.

At that time appellant was in the rear, and by the time he got up even with the parties Johnson had arisen and he and deceased were engaged in a general fight. What then occurred is thus told by the appellant:

"Just as I got off my horse, Johnson says, 'Don't cut me, I ain't got nothing,' and he backed off and I started to them, and they come around there that way (indicating) and he says 'Don't cut me, I haven't got nothing,' and I run around them and started to—Mr. Johnson jumped between me and him and I says 'Don't do that—don't cut that man'—he struck at him with the knife—he struck him kindly in the coat collar there (indicating) and as he struck another lick I shot him."

It is claimed that the deceased fell upon his back about ten feet from the edge of the pike. During the melee the two horses ridden by deceased and Johnson ran off toward London, and after the killing appellant and Johnson got upon the horse ridden by the former, and leaving deceased as he had fallen, they returned to London where they surrendered themselves to the sheriff. There were no eyewitnesses to the occurrences at the time of the killing except the two defendants whose narratives coincide with what we have stated.

The body of the deceased was taken to London by the sheriff, assisted by appellant and others, a short while afterward, and it was found that there were several cuts and bruises on different parts of his face, and a hole where the bullet had entered the corner of his mouth in the edge of his mustache which ranged upward at an angle of about forty-five degrees. He had some cut places on his coat and vest, and one of his wrists was bruised, but whether that bruise was made at the time of the fight or in handling the body afterward is not made clear.

A witness for the Commonwealth testified to the effect that she heard the epithets claimed by defendants to have been spoken by deceased at the time of the shooting, but this witness saw no part of the difficulty, recognized

no one's voice, and did not know who spoke the words to which she testified.

Robert Matthews, introduced by the Commonwealth, testified that at a short distance from the scene of the killing he and three others saw three men pass along the road and heard a voice say, "Wait until we get on the pike and we will ———." He says that for some reason he did not hear the sentence completed. Elmer Johnson lived near the place of the killing; he had been sick, but was convalescing, and from his bed near a window he heard some one say, "Hold him, Jeff, hold him," and immediately a shot was fired in the direction of the place where deceased was killed  Immediately witness heard horses running down the pike toward London.

Mrs. Moore was in her residence near the scene and heard "bad language and heard some one say 'Oh Lord,' " and as soon as witness took two steps into her room a pistol fired, after which she heard horses running upon the pike.

Claude Miller testified that he was sitting on the railroad track about 250 feet from the place of the killing, and that three men passed along the road, one about thirty or forty feet ahead of the other two; that when they arrived at about the place of the killing they appeared to stop and he heard some one say, "Hold him, Jeff, hold him," and then a voice said, "Step back, Jeff," and immediately the pistol fired and he heard horses running down the pike. Witness knew none of the parties, neither could he tell who spoke the words to which he testified.  (It might be well to state that the defendant, Johnson, goes by the name of Jeff.)

Mrs. Warren, heretofore mentioned, testified that while she was at her gate to ask defendant to take the deceased from her house the former said, "I am going to tell Mrs. Warren what I am going to do," which remark she testified was made in the presence of Johnson, but that defendant made no explanation of the remark. The overcoat which Johnson wore on the occasion was introduced on the trial and it had a gash in the collar. Defendants claim that this was made that night and was discovered by them after their return to London. An open knife was found near the body of deceased, which is admitted to belong to appellant, and as he claims was the one delivered to deceased at the overhead bridge.  An-

other knife was in the deceased's pocket, which was shown to belong to him, and it was unopened. He also had in his pockets a five dollar bill and some small change, and three or four pistol cartridges.

It is in proof that the appellant had on two prior occasion committed homicide, once in Breathitt county and once in Rockcastle county, for each of which he was indicted and convicted. There were, as is usual in such cases, other circumstances bearing more or less upon the issue involved, but enough has been stated to show that the first contention made by the appellant on this appeal can not be sustained. The killing is admitted, and if the Commonwealth's witnesses are to be believed it was done under circumstances which did not justify it, or, at any rate, under such circumstances as would authorize a jury to find that it was unjustifiable.

The second contention is based on what occurred during the cross-examination of the sheriff, who was introduced by the Commonwealth. Witness was asked if he saw deceased in London the afternoon before the killing and he answered in the affirmative, stating that deceased inquired for appellant and "said he wanted to see Bill (appellant), and see if he could get him to go with him after some ———." At this point the Commonwealth objected, which objection was sustained. No avowal was made as to what witness would have said had he been permitted to finish the sentence, but it is argued in brief that the omitted word was "whiskey." Even if this testimony had been material, and the error in rejecting it had been cured by an avowal, we are convinced that its rejection did not affect the substantial rights of appellant, since other witnesses testified to the same facts, and it is admitted by every one that the sole purpose of the visit of deceased to London was to get appellant to assist him in getting whiskey. The error of the court, if one, could not and did not substantially prejudice the rights of the appellant.

In substantiation of the third ground urged for reversal, appellant filed about eighteen affidavits, while the Commonwealth filed a large number of contradictory ones. To recite even the substance of these affidavits, or the points in the case upon which they are supposed to bear, would carry this opinion beyond due limits. Suffice it to say that we are thoroughly convinced that those

bearing upon only three of the issues attempted to be presented by the alleged newly discovered evidence are of sufficient merit to require our notice.

Affidavits of three witnesses were filed, in which they stated that they heard the remark testified to by the witness Matthews, as well as the completion of the sentence, and that said remark was "Wait until ge get on the pike and I will *show you how to ride that horse.*" It is claimed that from the unfinished statement testified to by the witness, Matthews, the Commonwealth attempted to draw the inference that the finished statement contained some character of threat by defendants against the deceased, and that the jury might have been authorized to so conclude, while the completed sentence, as contained in the affidavits of the witnesses, made the remark an innocent one. This contention of defendant's counsel might be admitted at least to some extent, but we do not think the alleged newly discovered testimony was of sufficient materiality to authorize a reversal of the case.

But waiving this point, the three alleged newly discovered witnesses were those whom Matthews stated were with him at the time, and nowhere in the record does it appear that any effort was subsequently made by defendant to procure the presence of those witnesses. Under the frequent ruling of this court to the effect that the moving party, before he can take advantage of newly discovered evidence on motion for a new trial, must have exercised due diligence to procure the testimony, it can not be seriously contended that the court erred in declining to grant a new trial because of such newly discovered testimony. Knipp v. Commonwealth, 159 Ky. 775. Furthermore, appellant and his co-defendant in their testimony, which was given after that of the witness Matthews, never referred to the testimony of that witness. They neither admitted nor denied the making of such statement, nor attempted to explain it in the way now sought by the testimony of the alleged newly discovered witnesses. If it were true, as is now claimed, surely defendants themselves could have said so when they were on the stand.

Again, there were affidavits filed by those who claim to have been at, or near, the place where the Commonwealth witness, Claude Miller, stated that he was, and that they neither saw Miller nor heard the remarks testified to by him. This testimony is at best but negative in

character and contradictory only of Miller. The rule is that newly discovered testimony which only contradicts a witness for the opposing party will not be sufficient to grant a new trial. Gee v. Commonwealth, 178 Ky. 666, and cases therein referred to. But, in the absence of such a rule, it is doubtful whether the proper diligence was shown in the effort to procure these newly discovered witnesses, for they all lived in that immediate vicinity, and it is shown that they were talked to before the trial, and if they really knew the facts as set forth in their affidavits it is very surprising that defendants failed to discover it. It does not appear that they made any effort to do so, since appellant contents himself with the bare statement that he did not *discover* such facts until fter the trial.

We therefore conclude that the court did not err in refusing a new trial on account of this alleged newly discovered evidence.

It is seriously insisted that the testimony contained in the affidavit of Emma Warren was of such a decisive nature as to require the granting of a new trial. This witness is the daughter of the Commonwealth witness, Eliza Warren, and both she and her mother were summoned and attended the trial. It is shown that both of them conversed with appellant's attorneys in their office, and that appellant himself visited the Warren home before the trial, he having executed bond for his appearance in circuit court. The affidavit of Miss Warren states that when the deceased went into her mother's house on the night of the killing, and while the latter was at the gate talking to defendants as heretofore shown, she was accosted by the deceased, who threatened to kill her if she did not submit to his desires and at the same time drew a large open knife from his overcoat pocket which corresponded in appearance to appellant's knife found on the ground near the body of deceased; that she notified her mother of these facts immediately afterward. It is indeed strange that during the two months when plaintiff was on bond, knowing that deceased went into the Warren house, he could not discover these facts, although it does not appear that he ever endeavored to elicit them from either of the witnesses, or that they declined on any occasion to answer any questions propounded to them.

It is insisted by the Commonwealth that this testimony is cumulative only, and is not sufficient under the well established rule of this state to authorize the granting of a new trial upon newly discovered evidence. We are not entirely in accord with this contention of the Commonwealth, since evidence is not necessarily cumulative because it tends to the establishment of the principal fact. If it is directed toward the establishment of a collateral fact or circumstance, about which no testimony had been introduced, but which bears upon the principal fact, it is not necessarily cumulative. Waller v. Groves, 20 Conn. 305; Albert v. Meritt, 16 Ia. 121; Schlenker v. Bisley, 38 Amer. Dec. 100; 29 Cyc. 908-9; I. C. R. R. Co. v. Wilson, 31 Ky. Law Rep. 789. These authorities in substance hold that evidence which brings to light some new and independent truth of a different character, although tending to prove the same principle, proposition or claim, is not cumulative within the rule now under consideration. Especially so if the collateral or independent fact or circumstance would likely be of controlling influence with the jury. The facts sought to be established by the alleged newly discovered testimony of Emma Warren was an independent circumstance tending to show that deceased had borrowed appellant's knife and perhaps had it and was using it at the time he was killed. But, as seen, before even this character of newly discovered testimony can be allowed as a ground for setting aside a verdict due diligence must have been shown in an effort to discover it, and we think there is an entire failure in this respect in this case. It is not sufficient for the applicant only to allege that he exercised due diligence to procure the testimony claimed to have been discovered; he must go further and allege facts showing to the court that such diligence was exercised. Russell v. City of Ashland, et al., 159 Ky. 223, and Home Insurance Company v. C. N. O. & T. P. Ry. Co., 182 Ky. 778.

But, beyond this, the evidence had for its purpose the proving of a fact which no one denied, and which may have been found by the jury to be true, and yet appellant be guilty of the offense of which he was convicted. Conceding that deceased had the knife at the time he was killed, still the appellant had no right to kill him unless at the time of the firing of the fatal shot "he believed and had reasonable grounds to believe that he or the defend-

ant Johnson was then and there in danger of death or the infliction of great bodily harm at the hands of said Manus, *and that it was necessary*, or *was believed by the said Mullins to be necessary* in the exercise of a reasonable judgment, to so shoot and kill the decedent in order to avert that danger, real, or to the defendant apparent."

According to the story as told by appellant and his co-defendant, the jury might well have concluded that it was not necessary in order to defend Johnson for appellant to kill deceased. In other words, there were grounds for concluding that he used more force than was necessary. The deceased was evidently very much intoxicated. Much more so than either of the defendants, and common observation and experience convince us that the two could have easily handled him and averted any threatened danger without taking his life. Whether so or not, the jury were authorized under the facts to so conclude, and upon the whole case we are unable to find an error of sufficient importance under the well known rules of criminal practice to authorize a reversal of the judgment, and it is therefore affirmed.